# United States District Court
# District of Massachusetts

PETER J. DONOVAN,
      Plaintiff,

      v.                         CIVIL ACTION NO. 13-12210-IT

WILLIAM KELLEY,
      as an individual and in
      his official capacity as Legal Counsel
      of the Massachusetts Alcoholic
      Beverages Control Commission;
CAROLINE GUARINO-WILICHOSKI,
      as an individual and in
      her official capacity as Investigator
      of the Massachusetts Alcoholic
      Beverages Control Commission;
KIM GAINSBORO,
      as an individual and in
      her official capacity as Chairman
      of the Massachusetts Alcoholic
      Beverages Control Commission;
ROBERT CRONIN,
      as an individual and in
      his official capacity as Commissioner
      of the Massachusetts Alcoholic
      Beverages Control Commission;
SUSAN CORCORAN,
      as an individual and in
      her official capacity as Commissioner
      of the Massachusetts Alcoholic
      Beverages Control Commission,
            Defendants.

# REPORT AND RECOMMENDATION ON MOTION TO DISMISS BY DEFENDANTS (#27)

COLLINGS, U.S.M.J.

## I. Introduction

This dispute arises out a decision by the Massachusetts Alcoholic Beverages Control Commission ("ABCC") to refuse approval of *pro se* plaintiff Peter J. Donovan's ("Donovan") request to transfer a liquor license to a third party. There are five-named defendants, each of whom is sued in his/her individual and official capacities. The defendants include: William Kelley, general counsel for the ABCC ("Kelley"); Caroline Guarino-Wilichoski ("CGW"), investigator for the ABCC; Kim Gainsboro ("Gainsboro"), Chairman of the ABCC; Robert Cronin ("Cronin"), Commissioner of the ABCC; and Susan Corcoran ("Corcoran"), Commissioner of the ABCC (collectively, "the defendants").

On September 6, 2013, Donovan instituted this action against the defendants by filing a four-count complaint. (#1) On September 30, 2013, in lieu of answering the complaint, the defendants filed a motion to dismiss

pursuant to Rule 12(b)(6), Fed. R. Civ. P. (#10), together with a memorandum of law in support thereof. (#11) The plaintiff filed an opposition to this initial motion on October 7, 2013. (#13) Thereafter on November 21, 2013, Donovan filed a motion to amend his complaint (#19) and then four days later he submitted a revised opposition to the motion to dismiss. (#20) The defendants moved to strike the revised opposition (#22) and, in response, the plaintiff filed a motion to amend his opposition to the motion to dismiss. (#23) The defendants opposed the plaintiff's motion to amend. (#25)

On December 17, 2013, the motion to amend the complaint was allowed, the motion to strike was denied and the motion to amend the opposition was allowed. (#26) Thus, the amended complaint (#19-1), which incorporates an additional count (Count V) for retaliation, became the operative pleading in the case. On December 31, 2013, the defendants filed a motion to dismiss the amended complaint (#27) along with a memorandum of law in support. (#28) Following a couple of extensions of time, on March 17, 2014, Donovan filed an opposition to the dispositive motion. (#38) At this juncture, the record on the motion to dismiss the amended complaint is complete, and the dispositive

motion stands ready for resolution.[1]

## II. The Allegations[2]

Donovan is the sole proprietor of Corporate Wines, and he (d/b/a Corporate Wines and later through WBO Woburn, Inc.) holds two liquor licenses pursuant to a Massachusetts state statute: a retail license under Mass. Gen. L. c. 138 § 15 and a wholesale license under Mass. Gen. L. c. 138 § 18. (#19-1 ¶¶ 2, 14) The plaintiff's business model focuses on selling alcohol through mail/internet orders and uses common carriers to ship products to consumers in the Commonwealth. (#19-1 ¶ 15) His business is "the only one of it's (sic) kind in Massachusetts" because it handles both wholesale and retail wine deliveries. (#19-1 ¶ 19) Although the events giving rise to this case began in 2010, the plaintiff has a long history with the ABCC going back fifteen years, which, according to Donovan, results from the ABCC's dislike of his business

---

[1]

On January 2, 2014, the motion to dismiss the amended complaint was referred to the undersigned for the issuance of a report and recommendation as to disposition. (#29)

[2]

In ruling on the Rule 12(b)(6) motion, the Court may only rely on the facts alleged and documents incorporated within the four corners of the amended complaint. *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009). To the extent that the plaintiff proffers new or different facts in his memorandum in opposition to the dispositive motion (#38) or additional exhibits apart from a published court decision (#38, Exh. A-C, E-I), those facts and documents cannot be considered, including what appear to be unauthenticated, non-certified court documents.

model.[3] (#19-1 ¶ 33)

The ABCC is charged by the Commonwealth of Massachusetts with the "general supervision of the conduct of the business of manufacturing, importing, storing, transporting and selling of alcoholic beverages" within Massachusetts (Mass. Gen. L. c. 10 § 71) and, as well, with making "rules and regulations necessary to effectuate its alcohol oversight, licensing, and enforcement" (Mass. Gen. L. c. 138 § 19F(I)). (#19-1 ¶ 8)  During the relevant period, Kelley was general legal counsel at the ABCC and had been an employee of the organization since 1991.[4] (#19-1 ¶ 3)  CGW is a investigator at the ABCC. (#19-1 ¶ 4)  Gainsboro is the Chairman of the ABCC. (#19-1 ¶ 5)  Cronin is a current Commissioner at the ABCC. (#19-1 ¶ 6)  Corcoran is a also a current Commissioner at the ABCC. (#19-1 ¶ 7)  CGW, Gainsboro, Cronin, and Corcoran were employees of ABCC as of September 6, 2013, and at all other times relevant to the amended complaint. (#19-1 ¶¶ 4-7)

Donovan sold wine to clubs that were affiliated with MWWC, Inc., SL

---

[3]

The plaintiff asserts that "[g]oing back to 1994 the ABCC has always had an issue with a company like the one Mr. Donovan operates." (#19-1 ¶ 17)  He further contends that at some point in 1996, Walter Sullivan, then ABCC Chairman, indicated that he and the ABCC were against the operation of mail order retail in the MA Beverage Journal, despite their legality under Massachusetts law. (#19-1 ¶ 17)

[4]

In August 2013, Kelley resigned from the ABCC to become president of The Beer Distributors of Massachusetts, Inc.  (#19-1 ¶ 3)

Group, Inc., DW Holdings, Inc., and Direct Wines International Limited (collectively, "The Group") from 2008-2010. (#19-1 ¶ 18) In early 2010, The Group became interested in acquiring Donovan's retail and wholesale liquor business. (#19-1 ¶ 20) In April 2010, Donovan received approval from the Woburn License Commission (the "WLC"[5]) to transfer his retail liquor license to The Group. (#19-1 ¶ 21) In August 2010, about four months after the WLC transfer approval was transmitted to it, the ABCC started work on the transfer request. (#19-1 ¶ 22) On August 23, 2010, after rounds of due diligence by ABCC regarding The Group, CGW initially made an internal recommendation to approve the transfer of the liquor license. (#19-1 ¶ 23[6]) Nothing was communicated to Donovan for the next couple of weeks. (#19-1 ¶ 24) According to Donovan, it is common knowledge that the average time for the ABCC approval process to transfer a liquor license is about 90 days. (#19-1 ¶ 26)

---

[5]

The WLC is the licensing authority for the City of Woburn, the location of Corporate Wines, which has the power to issue liquor licenses to businesses operating in its jurisdiction. *See* Mass. Gen. L. c. 140 § 1.

[6]

The recitation in the document entitled Recommendation of the Investigator (#19-1, Exh. B) indicates that on September 2, 2010, the application was referred back to CGW for further investigation with respect to the restriction in certain court documents that Donovan would not transfer his liquor license for at least ten years. Based upon the additional information and investigation, on September 10, 2010, the investigator recommended that the application to transfer the license be disapproved. (#19-1, Exh. B)

On September 5, 2010, Donovan sent a letter by fax and first class mail to the Chairman of the ABCC expressing his frustrations. (#19-1 ¶ 24) A copy of this letter was also sent to Kelley and CGW. (#19-1 ¶ 24) On September 14, 2010, the ABCC denied Donovan's license transfer request citing a restriction in a 2006 court settlement with the City of Woburn. (#19-1 ¶ 25) On October 14, 2010, Donovan received approval to waive the transfer restriction in the 2006 court settlement from the WLC. (#19-1 ¶ 27)

In December 2010, the ABCC approached Donovan with another round of questions regarding the transfer of the liquor license. (#19-1 ¶ 28) The plaintiff alleges that these questions had been previously addressed in August 2010. (#19-1 ¶ 28) During this time, CGW mentioned that the ABCC had a open investigation involving the transferee, The Group. (#19-1 ¶ 28) The plaintiff alleges that to delay the transfer application further, around this time the ABCC assigned two investigators to Donovan's transfer application who were under investigation for taking bribes. (#19-1 ¶ 36)

Later in December 2010, due to the delay in the transfer process, The Group got frustrated and decided to rescind their offer to acquire the license from Donovan. (#19-1 ¶ 29) Donovan estimates that he lost over $1,000,000

consequent to the license not being transferred.[7] (#19-1 ¶¶ 29, 37)

Commissioners of the ABCC would go directly to Kelley if they have any problems or industry issues. (#19-1 ¶ 32)  Donovan contends that the Commissioners just went along with Kelley's recommendation to deny the transfer application without looking deeper into the subject matter.[8] (#19-1 ¶

---

[7]

Donovan also alleges that The Group spent roughly $200,000 in legal fees attempting to effectuate the transfer. (#19 ¶ 29)

[8]

Donovan points to a history of delays dating back to 1999 to support his contention that the events during 2010 were a campaign by the ABCC, and reflect Kelley's grudge against him. (#19-1 ¶ 30)  This campaign purportedly began in August 1999 when Donovan won his first legal action against the ABCC, *The Boston Beer and Wine Company, Inc. v ABCC*. (#19-1 ¶ 33)  Prior to that case, the ABCC had ruled in favor of the city of Woburn which had denied Donovan's application for a liquor license. (#19-1 ¶ 33)  This led to the court action *The Boston Beer and Wine Company, Inc. v ABCC*, wherein the court overturned the ABCC's ruling in August 1999. (#19-1 ¶ 33)  Thereafter Donovan had to file a contempt of court action in May 2000 against the ABCC to remand the matter back to Woburn for further hearing. (#19-1 ¶ 33)  The original denial and delay which required the filing of the contempt of court action were allegedly caused by Kelley because he had a bias against mail order type businesses. (#19-1 ¶ 33)

In January 2006, Donovan was awarded the liquor license in question by court order in *Peter J. Donovan v. City of Woburn et. al. (#19-1 ¶ 34)*  The WLC approved the awarded license to be issued in March 2006. (#19-1 ¶ 34)  The ABCC approved the awarded license in June 2006. (#19-1 ¶ 35)  However, around this time Kelley ordered an informational hearing be held in August 2006, and the ABCC would not issue the liquor license while the hearing was pending. (#19-1 ¶ 35)  Kelley would not advise Donovan's counsel why an informational hearing was to be conducted. (#19-1 ¶ 35)

On the day of the hearing in August 2006, Donovan arrived with his attorneys to discover that Kelley was on vacation and none of the ABCC Commissioners knew why the hearing was scheduled. (#19-1 ¶ 35)  This delay allegedly cost Donovan over $5,000 in legal fees. (#19-1 ¶ 35)  The license was issued later that month by the ABCC. (#19-1 ¶ 35)

All of these events transpired six or more years before this lawsuit was filed, and any claims arising from those events would be time-barred. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007); *Holmes v. Meleady*, 738 F. Supp.2d 196, 201 (D. Mass. 2010) ("Section 1983 does not contain a statute of limitations and federal courts therefore borrow the forum state's limitation period for personal injury tort claims.  For claims arising in Massachusetts, the period is three years." (citations omitted)); Mass. Gen. L. c. 260 §§ 2A and 5B.

31)

In May 2013, CGW visited Donovan's company, WBO Woburn, Inc., in Woburn, MA. (#19-1 ¶ 38) CGW came to investigate a tip from an anonymous informant that WBO Woburn, Inc. was illegally selling products under wholesale cost. (#19-1 ¶ 38) This was subsequently proven to be a false allegation. (#19-1 ¶ 38) A week after the complaint in this case was filed, an unidentified man visited WBO Woburn, Inc.'s premises demanding to purchase wine for below wholesale cost. (#19-1 ¶ 39) The plaintiff alleges that this unidentified man was either employed or hired by the ABCC to coax Donovan's employees into doing something illegal as a retaliation for the court complaint. (#19-1 ¶ 39)

### III. The Claims

In Count I of the amended complaint, Donovan alleges that the ABCC's September 14, 2010 decision not to allow the transfer of the liquor license was made with malice, was an abuse of discretion and abuse of power. (#19-1 ¶¶ 47-50) It is alleged in Count II that the ABCC's September 14, 2010 decision was in violation of 42 U.S.C. ¶ 1983. (#19-1 ¶¶ 51-6) Next in Count III the plaintiff alleges that the ABCC's September 14, 2010 decision was a violation

of the Equal Protection Clause of "Class of One" of the Fourteenth Amendment. (#19-1 ¶¶ 57-63) In Count IV it is alleged that the ABCC's September 14, 2010 decision was a violation of First Amendment rights under the United States Constitution and the Commonwealth of Massachusetts Constitution. (#19-1 ¶¶ 64-70) Lastly, Donovan alleges a retaliation claim in Count V, contending that the ABCC sent someone to his place of business within a week of the ABCC having been served with the summons and complaint in this case. (#19-1 ¶¶ 71-4)

The plaintiff seeks compensatory and punitive damages of at least $1,000,000 trebled, plus interest, attorneys' fees and costs. (#19-1 ¶¶ 50, 56, 63, 70, 74, Prayers for Relief ¶¶ 1-4)

## IV. Standard Of Review

A Rule 12(b)(6) motion to dismiss challenges a party's complaint for failing to state a claim. In deciding such a motion, a court must "'accept as true all well-pleaded facts set forth in the complaint and draw all reasonable inferences therefrom in the pleader's favor.'" *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Artuso v. Vertex Pharm., Inc.*, 637 F.3d 1, 5 (1st Cir. 2011)). When considering a motion to dismiss, a court "may augment

these facts and inferences with data points gleaned from documents incorporated by reference into the complaint, matters of public record, and facts susceptible to judicial notice." *Haley*, 657 F.3d at 46 (citing *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003)).

In order to survive a motion to dismiss under Rule 12(b)(6), the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "obligation to provide the grounds of [the plaintiff's] entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (quotation marks and alteration omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level," and to cross the "line from conceivable to plausible." *Id.* at 555, 570.

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). However, the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* at 678 (quoting

*Twombly*, 550 U.S. at 555). Simply put, the court should assume that well-pleaded facts are genuine and then determine whether such facts state a plausible claim for relief. *Id.* at 679.

Since the plaintiff is proceeding *pro se*, the court shall "liberally construe[ ]" his complaint, "however inartfully pleaded." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *see also Hughes v. Rowe*, 449 U.S. 5, 10 (1980); *Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ.*, 209 F.3d 18, 23 (1st Cir.2000). Where a *pro se* plaintiff presents sufficient facts, "the court may intuit the correct cause of action, even if it was imperfectly pled." *Ahmed v. Rosenblatt*, 118 F.3d 886, 890 (1st Cir.1997), *cert. denied*, 522 U.S. 1148 (1998). With that being said, nevertheless "pro se status does not insulate a party from complying with procedural and substantive law." *Id.*

## IV. Discussion

### A. Failure to Plead

Before addressing the merits, it is noted that three of the defendants, Gainsboro, Cronin, and Corcoran, are only mentioned by name twice in the amended complaint, to wit, in the caption and in paragraphs identifying them

as defendants. (#19-1 ¶¶ 5-7)  The plaintiff also references "Commissioners" in paragraph 31, which likely refers to Cronin and Corcoran since they are identified as holding that position.

In order to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead sufficient factual bases to make his entitlement to relief from the defendants plausible. *See Iqbal*, 556 U.S. at 679; *Twombly*, 550 U.S. at 555. Further, to satisfy the minimal requirement of notice pleading, a plaintiff cannot aggregate multiple defendants together but instead must "state clearly which defendant or defendants committed each of the alleged wrongful acts." *Bagheri v. Galligan,* 160 Fed. Appx. 4, 5 (1st Cir. 2005); *see also Atuahene v. City of Hartford,* 10 Fed. Appx. 33, 34 (2nd Cir. 2001) ("By lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, [plaintiff's] complaint failed to satisfy this minimum standard . . . ."); *Gary v. McDonald,*  2014 WL 1933084, at *1 (D. Mass., May 13, 2014) ("In order to satisfy the minimal requirements of notice pleading, a plaintiff cannot lump multiple defendants together and must state clearly which defendant or defendants committed each of the alleged wrongful acts." (internal quotation marks, footnote and citation omitted)).  Because the allegations of the amended

complaint fail to set forth facts regarding how each of defendants Gainsboro, Cronin, and Corcoran violated the plaintiff's constitutional rights, all the claims against these parties should be dismissed.

## B. Sovereign Immunity

The Eleventh Amendment bars suits against states in federal court without their consent. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). Suits seeking monetary damages against state officers acting in their official capacities are likewise barred by the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State."); *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent . . . . In other words, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. This means, of course, that a public

official, sued only in his official capacity, is a proxy for the government entity that employs him and is in privity with that entity." (internal citations and quotation marks omitted)); *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 24 (1st Cir. 2007) ("In many instances, a suit against a state official is a suit against the state, thereby triggering Eleventh Amendment immunity. *See Muirhead v. Mecham*, 427 F.3d 14, 18 (1st Cir.2005) ('[A] suit, although nominally aimed at an official, will be considered one against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.').'" (further internal citation and quotation marks omitted)).  A state and its officials acting in their official capacities are not "persons" subject to a § 1983 suit for monetary damages. *Hafer*, 502 U.S. at 27; *Will v. Michigan Dept. Of State Police*, 491 U.S. 58, 71 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." (internal citation omitted)); *Wilson v. Brown*, 889 F.2d 1195, 1197 (1st Cir.

1989).

Donovan seeks monetary damages against Kelley and CGW in their official capacities.[9]  Such claims are barred by the Eleventh Amendment and should be dismissed.

## C. The Federal Claims

### 1. Due Process

Individual-capacity suits, as opposed to official-capacity suits, "seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, on the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer*, 502 U.S. at  25 (internal citation, quotation marks and alteration omitted); *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *Rojas-Velazquez v. Figueroa-Sancha,* 676 F.3d 206, 209 (1st Cir. 2012) ("To make out a viable cause of action under section 1983, a plaintiff must allege that the defendants, while acting under color of state law, deprived him of rights secured by the Constitution or federal law."); *Harron v. Town of Franklin*,  660 F.3d 531, 535 (1st Cir. 2011).

---

[9]
The plaintiff also seeks monetary damages against defendants Gainsboro, Cronin and Corcoran in their official capacities, and this analysis is fully applicable to those claims.

In Count II of his amended complaint, Donovan brings a claim for violation of 42 U.S.C. § 1983. Although not specified, presumably this is a due process claim.[10] There is no question here – and defendants do not contend otherwise – that the defendants were acting under the color of state law as the ABCC has authority to deny license transfer applications pursuant to Massachusetts statute. *See* Mass. Gen. L. c. 138 § 23. The salient issue is whether Donovan was deprived of any constitutionally-protected right.

As explained by the First Circuit:

> The Due Process Clause of the Fourteenth Amendment prohibits a state from depriving any person of 'life, liberty, or property, without due process of law.' U.S. Const. amend. XIV, § 1 . This prohibition is aimed at guarding against 'the arbitrary exercise of the powers of government.' *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S. Ct. 1708, 140 L.Ed.2d 1043 (1998). It 'applies fully to a state's political subdivisions, including municipalities and municipal agencies.' *DePoutot v. Raffaelly*, 424 F.3d 112, 117 (1st Cir. 2005).

*Harron,* 660 F.3d at 535 (further internal citations omitted).

There are procedural and substantive considerations at play under the Due Process Clause. *Id.* Procedural due process "'ensures that government, when

---

[10] This presumption is based on the fact that Count III sets forth is an equal protection claim and a First Amendment claim is alleged in Count IV.

dealing with private persons, will use fair procedures.'" *Id.* at 535 (quoting *DePoutot,* 424 F.3d at 118) (internal quotation marks omitted). Substantive due process "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." *Id.* at 535-36 (quoting *DePoutot,* 424 F.3d at 118) (internal quotation marks omitted); *Freeman v. Town of Hudson*, 714 F.3d 29, 40 (1st Cir. 2013)

### a. Substantive Due Process

When the constitutionality of certain executive acts are subject to a challenge under substantive due process, "'the plaintiff must show *both* that the acts were so egregious as to shock the conscience and that they deprived him of a protected interest in life, liberty, or property.'" *Harron,* 660 F.3d at 536 (quoting *Pagán v. Calderón*, 448 F.3d 16, 32 (1st Cir. 2006) (emphasis in original)). The First Circuit does not employ a rigid two-step analysis when addressing these two components, but frequently initiates the inquiry by determining "whether the acts alleged were conscience-shocking." *Id.* (citing *Martínez v. Cui*, 608 F.3d 54, 65 n.9 (1st Cir. 2010)).

The conduct alleged to be outrageous in this case was the ABCC's decision on September 14, 2010 to deny the plaintiff the right to transfer his liquor

license to The Group. (#19-1, Count II caption)  The stated reason for the denial was "that license could not be transferred due to a 2006 court settlement between Donovan and city of Woburn." (#19-1 ¶ 25 (internal quotation marks omitted))  As the ABCC's investigator's report reflects, in court documents filed settling state and federal civil cases commenced in 2003 and 2004, respectively, Donovan had agreed that "[t]here shall be no transfer of the liquor license or ownership of the business for at least ten years." (#19-1, Exh. 3, Recommendation of the Investigator)  Although it is alleged in the amended complaint "that ABCC (Kelley) used the city of Woburn to deny transfer because they had nothing to hang their hat on for denial - all in revenge of having a personal grudge against Donovan" (#19-1 ¶ 30), the plaintiff does not allege the existence of any dispute with respect to the fact that these court documents were filed, or the substance of restriction on the transfer of the liquor license was incorporated in those documents[11], or that ten years had not passed since

---

[11] Since the plaintiff specifically references the case of *Donovan v. City of Woburn*, Civil Action No. 04-10614-RWZ, in his amended complaint (*see* #19-1 at 16), the court filings in that case may be considered. *See Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir., 2009).  Although the text of the Settlement Agreement is not included in the Stipulation of Dismissal (#76) filed on July 6, 2006, via a letter to the Court dated June 5, 2012, Donovan filed an Amendment to Settlement Agreement (#77-1) which, in relevant part, acknowledges the restrictive condition:

> Now, therefore, for good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties agree as follows:

the filing of those documents. In fact, Donovan alleges that after the ABCC's

denial of the liquor license transfer, he returned to the WLC on October 14,

2010 "to have said condition waived" and then had the paperwork reflecting

that the City of Woburn waived the condition filed in the appropriate courts as

required by the ABCC. (#19-1 ¶ 27)

The First Circuit has held that:

> Executive acts that shock the conscience must be 'truly outrageous, uncivilized, and intolerable,' *Hasenfus v. LaJeunesse*, 175 F.3d 68, 72 (1st Cir.1999), and 'the requisite arbitrariness and caprice must be stunning, evidencing more than humdrum legal error,' *Amsden v. Moran*, 904 F.2d 748, 754 n. 5 (1st Cir.1990). Indeed, '[a] hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with violations of personal rights so severe[,] so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience.' *González–Fuentes v. Molina*, 607 F.3d 864, 881 (1st Cir.2010) (internal quotation marks and ellipses omitted).

---

1.    Condition No. 2 of the Settlement Agreement, which provides 'There shall be no transfer of the liquor license or ownership of the business for at least ten years' is hereby deemed waived. As a result, the ownership of the liquor license may be transferred by Peter J. Donovan, d/b/a Corporate Wines, (subject to local and states licensing approval) to WBO Woburn, Inc.

#77-1.

*Harron*, 660 F.3d at 536; *Freeman,* 714 F.3d at 40.

Indeed, the First Circuit has reiterated that "any permit or license denial, no matter how unattractive, that falls short of being 'truly horrendous' is unlikely to qualify as conscience-shocking." *Harron*, 660 F.3d at 536 (internal citations and quotation marks omitted); *Freeman,* 714 F.3d at 40.

Nothing in the facts alleged by the plaintiff with respect to the ABCC's September 14, 2010 decision denying the transfer of the liquor license rises to the level of being "truly horrific."[12] According to the plaintiff's allegations, the ABCC articulated a legitimate reason for the denial, to wit, the court documents in which Donovan had agreed not to transfer the liquor license for ten years. The substantive due process claim must fail, and that claim in Count II of the amended complaint should be dismissed.

### b. Procedural Due Process

In this circuit, "procedural due process questions [are examined] in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures

---

[12]

Even the delay alleged by Donovan, i.e., the ABCC did not start working on the application to transfer the license until August 2010 "almost four months after city of Woburn's approval," and then did not issue the denial until September 14, 2010, taking "over 150 days" when "based on common knowledge the ABCC approval process in transferring of a liquor license . . . was about 90 days (#19-1 ¶¶ 22, 25, 26), is not stunningly arbitrary.

attendant upon that deprivation were constitutionally sufficient."

*Harron*, 660 F.3d at 537 (internal citations and quotation marks omitted). Donovan's claim falters on the threshold question.

The plaintiff has not alleged any liberty interest, so the focus is on any purported property interest. "[P]roperty interests are defined by state law." *Harron*, 660 F.3d at 537. The liquor license at issue here, and indeed all liquor licenses issued in Massachusetts, are creatures of state statute. *See* Mass. Gen. L. c. 138 § 23. This statute explicitly conveys no rights:

> The provisions for the issue of licenses and permits hereunder imply no intention to create rights generally for persons to engage or continue in the transaction of the business authorized by the licenses or permits respectively[.] . . .
>
> No holder of such a license or permit hereunder shall have any property right in any document or paper evidencing the granting of such license or permit and issued by the licensing authorities[.]

Mass. Gen. L. c. 138 § 23; *see also Opinion of the Justices to the House of Representatives*, 368 Mass. 857, 862-63, 333 N.E.2d 414, 418-19 (1975) (indicating that a liquor license confers no property rights); *Jubinville v. Jubinville*, 313 Mass. 103, 106, 46 N.E.2d 533, 536 (1943) ("A liquor license once granted does not run with the business. It is a nontransferable personal privilege, revocable at pleasure, and conveying no vested interest to the licensee."). *But see In re Jojo's 10 Restaurant, LLC*, 455 B.R. 321, 327 (Bankr. D. Mass. 2011) (recognizing that the 1976 amendment to § 23 "created a limited property right in favor of a liquor licensee by permitting the licensee to pledge

the license as collateral for a loan, but only with the approval of the licensing authorities.").

Not only does the Massachusetts statute convey no property right in a liquor license, a licensee cannot be said to have a right to transfer a license because such requests are subject to approval from the licensing authorities. *See* Mass. Gen. L. c. 138 § 23 ("Any license under this chapter . . . may be transferred to any individual, partnership or corporation qualified to receive such a license in the first instance, if, in the opinion of the licensing authorities, such transfer is in the public interest."); *see also* Mass. Gen. L. c. 138 § 1 (defining "licensing authorities" to include the ABCC and/or WLC, the local licensing authority); *Grendel's Den, Inc. v. Goodwin*, 662 F.2d 88, 90 n.4 (1st Cir. 1981) (Plaintiff "has no 'entitlement' to a liquor license such as would implicate a property interest; nor does an application for a liquor license involve a 'fundamental' or 'natural' right such as the right to earn a living, engage in one's chosen profession, or even to engage in activities generally available to citizens on equal terms with others that might be characterized as a protected 'liberty' interest."). Further, any decision by a local licensing authority to issue or transfer a retail license under Mass. Gen. L. c. 138 § 15 is subject to approval by the ABCC.

Because Donovan has no protected liberty or property interest on the facts alleged in the amended complaint, his procedural due process claim in Count II of the amended complaint should be dismissed.

*2. Equal Protection*

In Count III, Donovan alleges that the ABCC's September 14, 2010 was a violation of the Equal Protection clause "Class of One" of the Fourteenth Amendment. In general terms,

> The equal protection guarantee of the Fourteenth Amendment prohibits the state from 'deny[ing] any person within its jurisdiction the equal protection of the laws.' U.S. Const. amend. XIV, § 1. With reference to a governmental action, this language has been interpreted to mean that 'all persons similarly situated should be treated alike.' *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Its protections extend to both legislative and executive conduct. *See Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 445, 43 S.Ct. 190, 67 L.Ed. 340 (1923).

*Pagan v. Calderon*, 448 F.3d 16, 34 (1st Cir. 2006).

The equal protection analysis that is applicable when a license or permit is denied is as follows:

> Where applicable state law vests the decisionmaker with discretionary authority to award or withhold a state benefit, a plaintiff who grounds an

24

equal protection claim on the denial of that benefit faces a steep uphill climb. *See PFZ Props., Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir.1991) (explaining that a denied applicant's allegations of differential treatment resulting from the decisionmaker's illegitimate motives do not normally amount to an equal protection violation). In benefit-denial cases, a plaintiff can succeed only if he shows that (i) he was treated differently than other similarly situated supplicants and (ii) the differential treatment resulted from a gross abuse of power, invidious discrimination, or some other fundamental procedural unfairness. *See, e.g., id.*; *Creative Env'ts[, Inc. v. Estabrook]*, 680 F.2d [822,] 832 n. 9 [(1st Cir. 1982)]. Even an arbitrary, bad-faith denial of a benefit in derogation of state law, without more, will not cross the constitutional threshold needed for an equal protection claim. *Baker v. Coxe*, 230 F.3d 470, 474 (1st Cir.2000).

*Pagan*, 448 F.3d at 34 -5 (footnote omitted).

With specific reference to Donovan's "class of one" allegation, "[t]o prevail on such a claim, [the plaintiff] must show that [he was] 'intentionally treated differently from others similarly situated and that there was no rational basis for the difference in treatment.'" *Freeman*, 714 F.3d at 38 (quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

The plaintiff asserts that the defendants singled him out "for the type of business he runs, supporting direct shipping, and not limited to the other issues mentioned." (#19-1 ¶ 60) However, there is no allegation in the amended

complaint that Donovan was treated differently from others similarly situated or any identification of such comparators, and there is a dearth of facts that would support any such an allegation. In light of these deficits, Count III of the amended complaint fails to state a claim and should be dismissed.

### 3. First Amendment

With respect to his First Amendment claim, the plaintiff alleges that:

> The actions of the defendants in their decision to deny transfer is based on a personal grudge going back some 15 years, was made in retaliation for Donovan being a constant critic of the ABCC and not limited to, was calculated to threaten, to harm, to punish, and to intimidate and coerce Donovan so as to have a chilling effect on exercise of his right to free speech . . . .

Amended Complaint #19-1 ¶ 44.

Further, it is alleged that:

> The Defendants 'singled out' Donovan for him speaking out against Defendants in many matters especially in court cases won by him against ABCC, about letters and amicus briefs he wrote in favor of direct shipping in MA that were published and specifically the letter he wrote in September 2010 criticizing ABCC officials.

Amended Complaint #19-1 ¶ 67.

Donovan's First Amendment rights are said to have been violated because:

> Donovan [was] winning lawsuits that support his

business, for the type of business Donovan runs (not a typical liquor store), for Donovan supporting direct shipping of wine into MA; for Donovan criticizing the MA Attorney General/ABCC in *Family Winemakers of California et al. v. Jenkins et al.* (USDC 06-11682-RWZ) . . . ; and finally for Donovan writing a letter to ABCC Chairman on or about September 5, 2010 criticizing the commission for '*dragging their feet*' (emphasis added) on approving the license transfer to a qualified buyer.

Amended Complaint #19-1 ¶ 46.

Based on this allegations, although not explicitly stated, the plaintiff's constitutional claim is presumed to be one for retaliation under the First Amendment.

The First Circuit has recently had occasion to address a comparable claim where a real estate agent alleged "that the Puerto Rico Real Estate Examining Board denied her a license in retaliation for her public criticism of the Board, thereby violating her rights under the First Amendment of the United States Constitution." *Maloy v. Ballori-Lage*, 744 F.3d 250, 250 (1st Cir. 2014). The Court explained that

[t]o hold the Board liable for unconstitutional retaliation, [the plaintiff] must show that 'her conduct was constitutionally protected' and that 'this conduct was a substantial factor or a motivating factor driving the allegedly retaliatory decision.' *Air Sunshine, Inc. v. Carl*, 663 F.3d 27, 35–36 (1st Cir.2011) (internal

> citations and quotation marks omitted). To survive a
> motion to dismiss, then, [the plaintiff] must have
> alleged facts sufficient to allow the court to draw the
> reasonable inference that her constitutionally
> protected activity was a substantial or motivating
> factor in the Board's denial of her subsequent
> application. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678,
> 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

*Maloy*, 744 F.3d at 252.

Assuming, *arguendo*, that Donovan engaged in constitutionally protected speech, his First Amendment claim must nevertheless fail because he has failed to plead sufficient facts from which it could be reasonably inferred that his protected speech was a substantial or motivating factor in the ABCC's decision to deny his application to transfer the liquor license. *See, e.g., Gagliardi v. Sullivan,* 513 F.3d 301, 308 (1st Cir. 2008).

Although the plaintiff alleges that he has a history of litigation with the ABCC, the settlement of those lawsuits predates the denial of the transfer application by more than four years. While Donovan's September 5, 2010 letter to the Chairman of the ABCC, Kelley and CGW was temporally closer to the September 14, 2010 denial, alone the letter is not enough to support a reasonable inference that Donovan's exercise of his First Amendment rights was a substantial motivating factor in the ABCC's decision in light of the other facts

alleged. For example, Donovan appended the Recommendation of the Investigator to his amended complaint. (#19-1, Exh. B) In that recommendation, CGW recites that September 2, 2010, Donovan's application for a transfer of his liquor license had been "referred back to this Investigator by the Executive Director and General Counsel for additional information and investigation," to wit, the court documents reflecting the plaintiff's agreement not to transfer the liquor license for ten years. (#19-1, Exh. B) In other words, the ABCC was already investigating the court filings upon which the ultimate denial was based *prior to* the time that Donovan sent his letter.

Moreover, as previously noted, Donovan has acknowledged that the restriction on him transferring the liquor license for ten years was incorporated in the settlement agreements, and he alleges that, after the transfer was denied, he took steps to have the WLC and Woburn waive that restriction and filed further court documents to reflect that amendment. While Donovan argues that the ABCC invoked the transfer restriction as a sham to deny his transfer application, he has not alleged any facts to support that supposition. The plaintiff has not alleged that he was eligible or qualified to transfer his liquor license at the time the ABCC denied his application, nor has he alleged that others in circumstances similar to his own had their applications approved. *See*

*Maloy*, 744 F.3d at 253; *Ramirez v. Arlequin*, 447 F.3d 19, 25 (1st Cir. 2006) ("[T]he case appears to be a routine First Amendment retaliation case. [Plaintiffs] must plead that they engaged in protected association, that they were entitled to payment under their contracts, and that the [defendant] Municipality denied the payment in retaliation for their exercise of associational rights."); *Baker v. Coxe,* 230 F.3d 470, 475 (1st Cir., 2000), *cert. denied,* 532 U.S. 995 (2001) ("The delay of a land use permit in unjustifiable retaliation for the applicant's expressions of his political views may violate the First Amendment if plaintiff proves three elements: that he engaged in protected speech, that he was qualified for the permit, and that the delay was in retaliation for the disfavored speech."); *Nestor Colon Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 41 (1st Cir. 1992) ("Turning first to denial of the *residential* site permit, we believe that [plaintiff] can be said to have stated a prima facie case of denial in retaliation for his political expressions. He says he is an outspoken member of an opposition political party and a critic of the government's environmental policies. The permit application was modified, at least in part, to conform to the PRPB's concerns expressed in its original denial of the permit, so that [plaintiff] was 'qualified' for the permit. Finally, and most critical in this context, the permit was allegedly denied 'despite the routine

grant of similar requests as to neighboring properties in the area.' This latter assertion, supported by some factual allusions, is key because it indicates the possibility of an illegal motive—that something about [plaintiff], perhaps his political views, caused him to be denied what otherwise would routinely have been granted.").

Because the plaintiff has not alleged sufficient well-pleaded facts to make his claim that the ABCC denied his transfer application in retaliation for his protected First Amendment activities plausible, i.e., to support a reasonable inference that his protected First Amendment activities were a substantial or motivating factor behind the ABCC's action, Count IV of the amended complaint should be dismissed.

### D. The State Claims

Since it is recommended that all of the federal claims in the amended complaint, Count II, II, and IV, be dismissed, the Court should decline to exercise supplemental jurisdiction over the state law claims alleged in Counts I, IV and V pursuant to 28 U.S.C. § 1367(c)(3) and dismiss those claims without prejudice.

### V. Recommendation

For all of the reasons stated, I RECOMMEND that the Motion to Dismiss

by Defendants (#27) be ALLOWED to the extent that Counts II, III, and IV, to the extent they allege federal claims, be dismissed with prejudice and that Counts I, IV, and V, to the extent they allege state law claims, be dismissed without prejudice to asserting them in a proceeding in state court.

## VI.  Review by the District Judge

The parties are hereby advised that any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Robert B. Collings

ROBERT B. COLLINGS
United States Magistrate Judge

June 27, 2014.